UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
FLORENCE ARNOW, ANA HAITH,          :
MARGARITA HARTOULAROS,              :
BLANCA MELGAR AND SILVANA           :
RODRIGUEZ                           :
           Plaintiffs,          :          11 Civ. 5460 (BSJ) (DCF)
                        :
        -against-               :
                        :
AEROFLOT RUSSIAN AIRLINES           :
                        :
          Defendant.           :
------------------------------------------------X

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Joshua S. C. Parkhurst
Melissa S. Chan
Liz C. Vladeck
Cary Kane LLP
*Attorneys for Plaintiff*
1350 Broadway, Suite 1400
New York, New York 10018
Phone: (212) 868-6300
Fax:   (212) 868-6302

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. i

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS ................................................................................... 5

      Reservation and Ticketing Agents ............................................................ 6

      Bonus Agents .............................................................................................. 6

      The ARC Department ................................................................................. 7

      Finance Department ................................................................................... 7

      Other Employees......................................................................................... 7

      New York Office Management.................................................................... 8

      The 2009 Layoffs ........................................................................................ 9

ARGUMENT ..................................................................................................... 17

      1.      Title VII ........................................................................... 19

      2.      Section 1981..................................................................... 20

      3.      ADEA ............................................................................... 20

      4.      New York State Human Rights Law ............................. 20

      5.      New York City Human Rights Law ............................... 22

POINT I.      PLAINTIFFS HAVE ESTABLISHED A PRIMA FACIE CASE ................. 23

POINT II.      DEFENDANT'S PURPORTED LEGITIMATE NON-DISCRIMINATORY REASON IS BASED ON INADMISSABLE EVIDENCE ............................ 25

POINT III.      PLAINTIFFS HAVE PUT FORTH SUFFICIENT EVIDENCE OF DISCRIMINATION TO AVOID SUMMARY JUDGMENT ....................... 27

      A.      Plaintiffs Have Demonstrated Evidence of Overt Bias In The Decision Making Process and in Their Treatment by Sokolov......................................... 28

B.      Sokolov's Decisions Were in Contradiction to What Was Directed by
        Corporate Headquarters. ...................................................................32

C.      Sokolov's Explanations Are Questionable and Inconsistent ............................34

        1.   Termination of Tamara Belova .......................................................35

        2.   The Distinction between "Call Center" Agents and Ticketing Agents.............36

        3.   Bonus Agents .........................................................................37

        4.   ARC Department ........................................................................38

        5.   Edita Djordjevic .......................................................................38

POINT IV.   DEFENDANTS HAVE NOT SHOWN THAT THE LAYOFFS WERE
            CONDUCTED IN THE ONLY POSSIBLE MANNER ..................................40

POINT V.    PLAINTIFFS' TITLE VII AND ADEA CLAIMS ARE NOT TO BE TIME
            BARRED ...............................................................................42


CONCLUSION.............................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Adickes v. S.H. Kress & Co.,*
    398 U.S. 144 (1970) .................................................................................................17

*Alleva v. New York City Dep't of Investigation,*
    696 F. Supp.2d 273 (E.D.N.Y. 2010) ...................................................................21

*Anderson v. Liberty Lobby Inc.,*
    477 U.S. 242 (1986)................................................................................................17

*Ansell v. Green Acres Contracting Co., Inc.,*
    347 F.3d 515 (3d Cir, 2003)..................................................................................35

*Asmo v. Keane, Inc.,*
    471 F.3d 588 (6th Cir. 2006) .................................................................................29

*Attard v. New York City Dep't of Educ.,*
    No. 05 Civ. 2129, 2010 U.S. Dist. LEXIS 104802 (E.D.N.Y. Sept. 30, 2010).....................22

*Brown v. Henderson,*
    257 F.3d 246 (2d Cir. 2001)............................................................................18, 27

*Cardozo v. Healthfirst, Inc.,*
    210 F. Supp.2d 224 (S.D.N.Y. 1997)....................................................................18

*Chan v. NYU Downtown Hosp.,*
    2004 U.S. Dist. LEXIS 16751 (S.D.N.Y. Aug. 23, 2004) ......................................35

*Colon v. Trump Int'l Hotel & Tower,*
    No. 10 Civ. 4794, 2011 U.S. Dist. LEXIS 140606 (S.D.N.Y. Dec. 6, 2011)..........................22

*Cronas v. Willis Group Holdings Ltd.,*
    No. 06 Civ. 15295, 2007 U.S. Dist. LEXIS 68797 (S.D.N.Y. Sept. 17, 2007) ......................43

*Danzer v. Norden Sys., Inc.,*
    151 F.3d 50 (2d Cir. 1998)....................................................................................17

*Desert Palace, Inc. v. Costa,*
    539 U.S. 90 (2003).................................................................................................28

*EEOC v. Doremus & Co.,*
    921 F. Supp.1048 (S.D.N.Y. 1995) .......................................................................24

*Feingold v. New York,*
    366 F.3d 138 (2d Cir. 2004)......................................................................................18

*Gallo v. Prudential Residential Servs., Ltd. P'ship,*
    22 F.3d 1219 (2d Cir. 1994)...............................................................17, 18, 23, 34

*Gorzynski v. Jetblue Airways Corp.,*
    596 F.3d 93 (2d. Cir 2010)......................................................................................18

*Greene v. City of Boston,*
    204 F. Supp.2d 239 (D. Mass. 2002) ......................................................................43

*Gross v. FBL Fin. Servs.,*
    557 U.S. 167 (2009)..........................................................................................20, 21

*Holcomb v. Iona Coll.,*
    521 F.3d 130 (2d Cir. 2008)..............................................................................18, 19

*Holowecki v. Fed. Express Corp.,*
    440 F.3d 558, 564 (2d Cir. 2006)...................................................................43, n. 18

*Holtz v. Rockefeller,*
    258 F.3d 62 (2d Cir. 2001)................................................................................20, 27

*House v. Wackenhut Servs., Inc. et al,*
    No. 10 Civ. 9476, 2012 U.S. Dist. LEXIS 130879 (S.D.N.Y. Aug. 20, 2012) ......................20

*Howlett v. Holiday Inns, Inc.,*
    49 F.3d 189 (6th Cir. 1995) ....................................................................................43

*James v. Countrywide Fin. Corp.,*
    849 F. Supp. 2d 296 (E.D.N.Y. 2012) ....................................................................20

*Jasco Tools v. Dana Corp.,*
    574 F.3d 129 (2d Cir. 2009)....................................................................................17

*Jones v. R.R. Donnelley & Sons Co.,*
    541 U.S. 369 (2004)................................................................................................20

*Kantrowitz v. Uniondale Union Free Sch. Dist.,*
    822 F. Supp.2d 196 (E.D.N.Y. 2011) .....................................................................20

*Kaytor v. Elec. Boat Corp.,*
    609 F.3d 537 (2d Cir. 2010)....................................................................................17

*Kerzer v. Kingly Mfg.,*
    156 F.3d 396 (2d Cir. 1998)....................................................................................18

*Loeffler v. Staten Island Univ. Hosp.,*
   582 F.3d 268 (2d Cir. 2009)..............................................................................22

*Mandell v. County of Suffolk,*
   316 F.3d 368 (2d Cir. 2003)..............................................................................25

*Mavrommatis v. Carey Limousine Westchester, Inc.,*
   476 Fed. Appx. 462 (2d Cir. 2011)....................................................................20

*McDonnell Douglas Corp. v. Green,*
   411 U.S. 792 (1973)............................................................................19, 20, 21

*McLee v. Chrysler Corp.,*
   109 F.3d 130 (2d Cir. 1997)..............................................................................18

*Nora Beverages, Inc. v. Perrier Group of Am., Inc.,*
   269 F.3d 114 (2d Cir. 2001)..............................................................................27

*Patterson v. County of Oneida,*
   375 F.3d 206 (2d Cir. 2004)..........................................................................26, 27

*Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.,*
   262 F. Supp.2d 251 (S.D.N.Y. 2003)................................................................29

*Phipps v. Comprehensive Cmty. Dev. Corp.,*
   2005 U.S. Dist. LEXIS 1672 (S.D.N.Y. 2005)..............................................27, 29

*Posner v. Sprint/United Mgmt Co.,*
   478 F.Supp.2d 550 (S.D.N.Y. 2007)..............................................................30, 31

*Reeves v. Sanderson,*
   530 U.S. 133 (2000)................................................................17, 18, 19, 28

*Regenbogen v. Mustille,*
   908 F. Supp.1101 (N.D.N.Y 1995)....................................................................25

*Riley v. HSBC United States, Inc.,*
   784 F. Supp. 2d 181 (W.D.N.Y. 2011)..............................................................26

*Riley-Jackson v. Casino Queen, Inc.,*
   No. 07 Civ. 0631, 2011 U.S. Dist. LEXIS 18761 (S.D. Ind. Feb. 25, 2011)..........43

*Rodriguez v. City of New York,*
   No. 09 Civ. 1378, 2011 U.S. Dist. LEXIS 91171 (E.D.N.Y. Aug. 16, 2011)........22

*Roge v. NYP Holdings, Inc.,*
   275 F.3d 164 (2d Cir. 2001)..............................................................................23

*Saenger v. Montefiore Med. Ctr.,*
   706 F. Supp.2d 494 (S.D.N.Y. 2010)............................................................21, 22

*Schnabel v. Abramson*,
    232 F.3d 83 (2d Cir. 2000)....................................................................................23

*Spiegel v. Schulmann*,
    604 F.3d 72 (2d Cir. 2010)....................................................................................21

*Sprint v. Mendelsohn*,
    552 U.S. 379 (2008)..............................................................................................35

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502 (1993).........................................................................................19, 28

*Stern v. Trs. of Columbia Univ.*,
    131 F.3d 305 (2d Cir. 1997)..................................................................................18

*Tex. Dep't of Cmty. Affairs v. Burdine*,
    450 U.S. 248 (1981)..............................................................................................19

*Tolliver v. Xerox Corp.*,
    918 F.2d 1052 (2d Cir. 1990)...........................................................................42, 43

*United States v. Aponte*,
    31 F.3d 86 (2d Cir. 2001)......................................................................................29

*United States v. Gilkeson*,
    431 F.Supp.2d 270 .................................................................................................36

*Weinstock v. Columbia Univ.*,
    224 F.3d 33 (2d Cir. 2000)...............................................................................18, 23

*Weiss v. JPMorgan Chase & Co.*,
    No. 06 Civ. 4402, 2010 U.S. Dist. LEXIS 2505 (S.D.N.Y. Jan. 13, 2010).............23

*Woodman v. WWOR-TV, Inc.*,
    411 F.3d 69 (2d Cir. 2005)....................................................................................24

*Windham v. Time Warner*,
    275 F.3d 179, 188 (2d Cir. 2001)..........................................................................24

*Zaken v. Boerer*,
    964 F.2d 1319 (2d Cir. 1992).................................................................................30

*Zimmermann v. Assocs. First Capital Corp.*,
    251 F.3d 376 (2d Cir.2001)....................................................................................25

**STATE CASES**

*Anderson v. Young & Rubicam*,
    890 N.Y.S.2d 45 (App. Div. 2009) .........................................................................21

iv

*DeKenipp v. State of New York,*
    949 N.Y.S.2d 279 (App. Div. 2012) ........................................................21

*Forrest v. Jewish Guild for the Blind,*
    3 N.Y.3d 295 (2004) .............................................................................21

*Williams v New York City Hous. Auth.,*
    872 N.Y.S.2d 27 (App. Div. 2009) ........................................................22

**FEDERAL STATUTES**

42 U.S.C. §1981 ..............................................................................................20

42 U.S.C. § 2000e-2(m) ..................................................................................40

42 U.S.C. § 2000e-5(g)(2)(B) .........................................................................40

**STATE STATUTES**

N.Y. Exec. Law § 296 .....................................................................................22

N.Y. Admin. Code § 8-130 .......................................................................22, n.8

N.Y. Labor Law § 193 .....................................................................................15

**RULES**

Fed. R. Civ. P. 56(c) .......................................................................................17

Local Rule 56.1 ........................................................................................2, 8, 26

## PRELIMINARY STATEMENT

Aeroflot Russian Airlines, Ltd. ("Aeroflot"), the flag carrier airline of the Russian Federation, conducted a purported reduction in force of its New York Office in 2009 whereby it fired all of its non-managerial employees who were not either Russian or Eastern European. The layoff also resulted in all employees over 52 being terminated and a reduction in the average age of the non-managerial employees in the New York office from 46.5, to 42.1. Aeroflot's own human resources manager confronted the General Director about the possibility that the layoffs were being conducted in a discriminatory manner. Instead of denying the allegations, he told her to get out of his office. The same Human Resources Manager also advised two of the plaintiffs in this action that they were victims of discrimination and that they should seek legal counsel. As the layoffs were being conducted, younger Russian employees whose previous jobs were later eliminated were given transfers to other positions that allowed them to keep their jobs. By contrast, plaintiffs found themselves stripped of job duties that would remain after the layoff. Aeroflot's General Director demonstrated vast knowledge of the qualifications of Russian employees, whom he kept and retrained, but expressed complete ignorance of the qualifications of the plaintiffs, whom he laid off. He also disregarded the findings and guidance of a consultant's report and subsequent decisions by Aeroflot's corporate headquarters that were the basis for Aeroflot restructuring its New York office in the first place.

There is ample evidence in the record from which a reasonable fact finder could conclude that the defendant's termination of the plaintiffs was motivated by race, national origin, and/or age. Because a jury is entitled to determine whether prohibited reasons were the actual reasons for plaintiffs' termination, defendant's motion for summary judgment should be denied.

## STATEMENT OF FACTS

Aeroflot is the Russian Federation's flag carrier airline. Defendant's Local Rule 56.1 Statement ("Def's. 56.1") ¶1; Plaintiffs' Response to Defendant's Rule 56.1 Statement ("Plaintiffs' 56.1") ¶1. Aeroflot's representation in New York includes an office located at Rockefeller Center and an office located at John F. Kennedy International Airport. Parkhurst Decl., Ex. 1 ("Sokolov Dep. Tr.") p.143:6-144:6. In 2008, 20 of the locally-hired employees of Aeroflot's New York representation worked in the Rockefeller Center office (where the General Director worked) and five worked at the airport. Parkhurst Decl., Ex. 11 ("List of Employees"). Local employees[1] in the Rockefeller Center office before the 2009 layoffs included six reservations agents, two "Bonus" (Aeroflot's Frequent Flyer program) agents, a secretary, an interline/human resources manager, two Airlines Reporting Corporation ("ARC") department employees, and one employee in charge of the New York representation's direct sales accounting. Parkhurst Decl. Ex. 2, ("Drobnjak Dep. Tr.") p.31:16-33:5. All employees were supervised by the General Director, who is responsible for all North American operations for Aeroflot, and who has sole authority to discipline, hire and fire local employees. Sokolov Dep. Tr. p.38:23-39:7, 59:6-13, 95:6-96:2.

Plaintiffs are all former employees of Aeroflot who have extensive experience in the travel industry. Plaintiff Florence Arnow was hired to work at Aeroflot on May 3, 2004. She was hired to work as a "Reservation and Ticketing Agent." Arnow Decl. ¶1, Ex. 1. She is of Jewish-American heritage and French ethnicity. Arnow Decl. ¶3. Arnow previously worked for Trans World Airlines, Carrier Travel, Jet Vacations, Air France, and Turkish Airlines as a reservations sales agent, and had extensive passenger interaction, including working with passengers both in

---

[1] As opposed to Russia-based employees, referred to in appended Aeroflot document translations as "staff," and appointed to their positions and sent from Moscow, who are not discussed herein.

person and on the phone and speaking many different languages, including Turkish. Parkhurst Decl., Ex. 4 ("Arnow Dep. Tr.") p.16:15-17:12; Arnow Decl. ¶4, Ex. 2.

Plaintiff Ana Haith was hired to work at Aeroflot on June 25, 2007. She was hired to work as a "Reservation and Ticketing Agent." She is Hispanic and of Costa Rican national origin. Parkhurst Decl., Ex. 5 ("Haith Dep. Tr."), p.8:18-9:10. Before working for Aeroflot, Haith owned her own travel agency and worked for a number of airline companies, including Access Air, Swiss Air, and TACA Airlines, as a Reservation and Ticketing agent. Haith Decl. ¶4, Ex. 2; Haith Dep. Tr. p.19:18-20:21. At Access Air, Haith served as a supervisor for Reservation and Ticketing agents and prepared daily sales reports. *Id.*

Plaintiff Blanca Melgar was hired to work at Aeroflot on September 3, 2001. She was hired to work as a "Reservation and Ticketing Agent." She is Hispanic and of El Salvadorian national origin. Parkhurst Decl. Ex. 7 ("Melgar Dep. Tr.") p.7:9-8:8; Melgar Decl. ¶1, Ex. 1. Melgar previously worked at Caterair International, at which she supervised 18 employees, and was detailed by a subcontractor to work at TACA Airlines and LACSA Airlines at John F. Kennedy airport, where she checked passengers in for their flights and worked in the ticket office. Melgar Decl. ¶4, Ex. 2. Melgar worked directly for LACSA as a Reservation and Ticketing agent and was trained in the Sabre program. *Id.* Melgar also received Sabre e-ticketing training while working for Aeroflot. Melgar Decl. ¶22, Ex. 3.

Plaintiff Margarita Hartoularos ("Hartoularos") started at Aeroflot as a Reservation and Ticketing Agent and Receptionist/Secretary on January 6, 1997. List of Employees; Hartoularos Decl. ¶1. She had worked for Aeroflot previously from 1989 through 1991 as a reservations agent. List of Employees, Parkhurst Decl. Ex. 6 ("Hartoularos Dep. Tr.") p.11:18-12:15. As secretary, Hartoularos took phone calls and transferred them, and sent, received, and distributed mail. Sokolov Dep. Tr. p.80:21-81:24. She was also assigned special projects by the managers in

the office. For example, Hartoularos was responsible for responding to customer grievances about things like lost luggage or poor service. The office received such complaints by email, fax, and mail. The office would receive, on average, about three or four letters, two or three phone calls, and two or three faxes per day from aggrieved passengers. She also handled communications with travel agencies regarding Aeroflot's promotional fares. Hartoularos Decl. ¶9. Hartoularos is Hispanic, and from Puerto Rico. Parkhurst Decl. Ex. 3 ("Zamora Dep. Tr.") p.133:9-10. Before coming to the United States, Hartoularos worked as a part-time instructor and as a public relations officer for the San Juan City Hall's Tourism Department in Puerto Rico. Hartoularos Decl. ¶4, Ex. 2. She worked as a travel consultant for Cavalcade Tours, as a reservations agent for Aeroflot Airlines, Iberia Airlines, and Air Jamaica, and as a customer service agent for the New York State Department of Motor Vehicles before starting at Aeroflot as a Reservation and Ticketing agent and receptionist. *Id.*

Plaintiff Silvana Rodriguez ("Rodriguez") was hired on March 19, 2001, originally as a Reservation and Ticketing agent. Rodriguez Decl. ¶1. Rodriguez is Hispanic, and from Argentina. Parkhurst Decl., Ex. 8 ("Rodriguez Dep. Tr.") p.7:2-6; Zamora Dep. Tr. p.141:3-15. She began working in the ARC department[2] later in 2001. Rodriguez Decl. ¶1. As ARC department supervisor, Rodriguez reported to and was supervised by the New York office's Commercial Manager, who reported to the General Director. Rodriguez Dep. Tr. p.40:8-43:5. In turn, Rodriguez supervised Irina Koroleva ("Koroleva"), the other ARC department employee, who is Russian, and who started at Aeroflot around the same time as Rodriguez. Sokolov Dep. Tr. p.84:2-85:5, 252:4-25; List of Employees. Before working for Aeroflot, Rodriguez worked for 25 Travel Inc. as a receptionist, performing Reservation and Ticketing work, preparing a weekly ARC sales report and a bi-monthly airline sales report, processing refunds, and handling

---

[2] *See infra* at p. 7 for a description of the ARC Department's functions.

bookkeeping. Rodriguez Decl. ¶4, Ex. 1. Rodriguez also performed work for Aerolineas Argentinas at the airport through a subcontractor. In that capacity, she provided administrative support to the assistant station manager, maintained detailed expense reports and monitored budget costs and accounts payable, among other duties. *Id.*

### Reservation and Ticketing Agents

Before the 2009 layoffs, the other Reservation and Ticketing agents were Luba Katz, Oxana Knysh, Nataliya Samuylova, Alla Khanimova, and Slavica Dascalovic. Of these five employees, all but Dascalovic were of Russian descent. Dascalovic is from the former Yugoslavia (specifically, Montenegro). Sokolov Dep. Tr. p.192:7-16, 201:4-8, p.224:5-9, 230:12-14, 242:4-5.

In its motion for summary judgment, Aeroflot tries to distinguish between the Reservation and Ticketing agents who worked in the "call center" as "Reservations Agents" and those who worked at the front desk as "Ticketing Agents." Evidence in the record, however, demonstrates that these functions are interchangeable. Both employees in the "call center" and at the front desk performed the same essential function of making reservations for passengers. The only distinction is that agents at the front desk would service the occasional customers who came in person to make their reservations, as well as print the tickets for reservations.[3] Zamora Dep. Tr. p.25:12-16; Melgar Dep. Tr. p.126:12-127:19; Drobnjak Dep. Tr. p.38-40; Arnow Decl. ¶9; Haith Decl. ¶9; Melgar Decl. ¶10; Rodriguez Decl. ¶9. Lidieth Zamora ("Zamora"), Aeroflot's Human Resources Manager, confirmed that printing tickets was not a significant task and that

---

[3] Employees in the call center took approximately 75 calls per day, a number which remained consistent up until the date of their termination. Arnow Decl. ¶¶10, 20; Haith Decl. ¶¶10, 21; Melgar Decl. ¶¶7, 32. By contrast, only 8-15 customers actually came to the office each day. Melgar Decl. ¶16; Hartoularos Decl. ¶8. The front desk employees were expected to service telephone customers when they were not servicing an in person customer. Melgar Decl. ¶16; Hartoularos Decl. ¶8; Arnow Decl. ¶9; Haith Decl. ¶9.

any employee could be trained over a brief period of time to do so. Zamora Dep. Tr. p.126:18-127:16; *see also* Arnow Decl. ¶11; Haith Decl. ¶12; Melgar Decl. ¶15.

Before the layoffs in 2009, the Reservation and Ticketing agents in the call center were plaintiffs Arnow, Haith, and Melgar as well as Luba Katz, Nataliya Samuylova, and Oxana Knysh before she was moved out of the call center. Arnow Decl. ¶1; Haith Decl. ¶1; Melgar Decl. ¶1; Sokolov Dep. Tr. p.192:7-16; 224:5-9; 242:4-5. The Reservation and Ticketing agents at the front desk were Alla Khanimova and Slavica Dascalovic. List of Employees. Despite this supposed distinction, plaintiff Melgar regularly worked at the front desk when one of the agents was on a break or on vacation, and her job functions were essentially the same as when she worked in the call center. Melgar Decl. ¶¶12, 13, 16.

### Bonus Agents

Before the 2009 layoffs, the two Bonus agents were Beata Sinai ("Sinai") and Elena Malysheva ("Malysheva"). Drobnjak Dep. Tr. p.50:16-52:9. Both were of Russian descent. Sokolov Dep. Tr. p.233:19-23, Belova Dep. Tr. p.61:32-62:2. Bonus agents make reservations and issue tickets to passengers availing themselves of Aeroflot's frequent flyer program. Drobnjak Dep. Tr. p.50:16-52:9. Plaintiff Melgar regularly performed such work when either "Bonus Agent" was absent from the office. Melgar Decl. ¶8. Contrary to defendant's allegations, knowledge of the Russian language is not necessary to work as a Bonus agent. Melgar Decl. ¶¶19-20. Although the Bonus reservations computer program had a passenger template with some Russian words in it, the Bonus agent did not need to speak or read Russian in order to access all the necessary information to assist passengers in determining how many Bonus miles they had, selling Bonus miles, booking their Bonus flights and issuing tickets to them. *Id.*; *see also* Zamora Dep. Tr. p.33:19-34:4.

### The ARC Department

The Airline Reporting Corporation ("ARC") is an airline corporation doing business in the United States and Canada. Sokolov Dep. Tr. p.46:6-19. Aeroflot ticket sales to travel agents were only made to those accredited by ARC. Aeroflot's ARC department would report its travel agent sales to ARC every month. Drobnjak Dep. Tr. p.53:14-25. The ARC department employees at Aeroflot would prepare the monthly report and provide support to the ARC accredited travel agencies. Drobnjak Dep. Tr. p.53:14-25. The ARC department also prepared Aeroflot's weekly sales reports for the east and west coasts of the United States.   Rodriguez Decl. ¶10.  In 2003, then-General Director Anatoli Deloveri promoted Rodriguez to the position of supervisor of the ARC department. Rodriguez Dep. Tr. p.37:17-38:20.

### Finance Department

The finance department, which handled internal accounting, had three members before the 2009 layoffs. *See* Parkhurst Decl., Ex. 10. Tamara Belova ("Belova"), who is from Belarus, worked for Aeroflot as the internal sales accountant in the sales department. Sokolov Dep. Tr. p.207:5-9; Belova Dep. Tr. p.10:10-15. In that capacity, she prepared the reports on sales for passenger trips, which were sent to Moscow. Belova Dep. Tr. p.11:15-12:10. The sales report consisted of all the sales that took place at the office and at the airport. At the end of the month, she received all the information on tickets sold and the payments. She reconciled the payments with bookkeeping and sent the report to Moscow. Belova Dep. Tr. p.12:11-13:7. The other two members of the finance department before the 2009 layoffs were Julia Grossman and Tatyana Marusina, who are both Russian. *See* Sokolov Dep. Tr. p.235:3-241:13.

### Other Employees

The remaining non-managerial employees in the New York office were plaintiff Hartoularos and Edita Djorjevic. Hartoularos, as administrative assistant, performed a wide

variety of administrative functions as noted above, including handling special projects such as dealing with customer complaints and contacting travel agencies about Aeroflot's promotional fares. Hartoularos Decl. ¶¶10-11. Djorjevic, who is from the former Yugoslavia (specifically Montenegro) handled pre-paid orders. Sokolov Dep. Tr. p.341:13-342:16; 210:5-20. She is also listed as a "Ticketing Agent" on Aeroflot's roster. List of Employees. With the advent of e-ticketing the need for pre-paid tickets dwindled and Djorjevic performed very little work before the layoffs. Arnow Decl. ¶¶15-16; Haith Decl. ¶18; Melgar Decl. ¶24; Rodriguez Decl. ¶21. Interestingly, defendant does not explain in its declarations or Local Rule 56.1 Statement what task she performed or why her position remained necessary once the layoffs commenced. The only explanation in defendant's memorandum of law is a vague explanation that her duties "…included handling cargo transportation for Aeroflot, as well as dealing with spare parts and various other Aeroflot properties." Def's Br. p.32. Defendant omits that Djorjevic only assumed cargo duties after the 2009 layoffs. Sokolov Dep. Tr. p.218:22-219:12

### New York Office Management

Valery Sokolov started working at the Rockefeller Center Office on March 24, 2008 as the Commercial Manager, a position held by an Aeroflot employee sent from Russia for a term of a few years. Sokolov Dep. Tr. p.44:19-45:20. In that capacity, Sokolov oversaw the New York representation's ticket sales and the ARC department. Sokolov Dep. Tr. p.45:21-46:19; 62:3-65:17. Sokolov became Acting General Director in November or December of 2008, and assumed all the responsibilities of General Director. Sokolov Dep. Tr. p.72:13-73:10, p.75:24-76:5. He also continued performing the work of a Commercial Manager. Sokolov Dep. Tr. p.181:5-11, 198:12-199:5; Melgar Dep. Tr. p.150:9-16.

Lidieth Zamora, who is Hispanic and originally from Costa Rica, served as the Human Resources Manager. Zamora Dep. Tr. p.15:13-21, 148:14-21. Dragan Drobnjak, who is Eastern

European and originally from the former Yugoslavia (specifically, Serbia), served as the Reservation and Ticketing Supervisor. Drobnjak Dep. Tr. p.8:12-9:7, 27:2-7. When determining whom to lay off, Sokolov did not discuss his considerations with anyone, including Drobnjak, Zamora, or his superiors in Moscow. Sokolov Dep. Tr. p.164:11-17, p.167:25-168:11; Zamora Dep. Tr. p.182:4-13. This directly contradicts Aeroflot's statement responding to the EEOC and NYS Human Rights Commission Complaints of the Plaintiffs, which represented that Lidieth Zamora was Sokolov's "right hand" in making decisions at the New York office. Parkhurst Decl. Ex. 15, Jun. 15, 2010 Letter Regarding Hartoularos, p.2.

### The 2009 Layoffs

This case involves  layoffs that were conducted in the New York office in 2009. Sokolov indicated in his deposition testimony that by the time he became Acting General Director he knew layoffs were likely in the near future. In December 2008, Sokolov spoke with friends who worked in Aeroflot's Moscow office and was told that Aeroflot was creating an Anti-Crisis Committee. He also became aware that McKinsey & Company ("McKinsey") was preparing a proposal for restructuring the New York office, and that there was a possibility of layoffs. Sokolov Dep. Tr. p.107:4-110:10, 122:13-123:2.

In December 2008 someone in Aeroflot's Moscow office told Sokolov to prepare information for McKinsey to use in its analysis. Sokolov Dep. Tr. p.118:13-119:8. This included employees' dates of birth, dates of hire, and education levels. Sokolov asked Zamora to compile the information. Once she did, he translated it and sent the information to Moscow. Sokolov Dep. Tr. p.119:9-23, 120:21-121:13.

The results of that analysis were discussed at a meeting in January 2009 at Aeroflot's Headquarters in Moscow, which Sokolov attended. Sokolov Dep. Tr. p.113:6-14; Parkhurst Decl., Ex. 13 ("Meeting Minutes"). Neither the report nor the minutes of that meeting – both of

which are absent from defendant's recitation of the facts – reflect that Aeroflot faced economic problems. *See* Parkhurst Decl., Ex. 19 ("McKinsey Report") (using terms like "cost reduction" and "optimization"); Meeting Minutes. Indeed, Aeroflot announced in early 2010 that it had succeeded at being one of only two airlines in the world to remain profitable in 2009, the worst year of the crisis. Parkhurst Decl., Ex. 16.

The January 2009 meeting minutes indicate that based on McKinsey's report, Aeroflot decided to restructure operations at several foreign offices, including the flagship New York office. *See* Meeting Minutes, p.3. It adopted some of McKinsey's recommendations about how to restructure the New York office, as well as an itemized list of what positions the office should have including how many – and what kind of – employees should have them. *Id.* According to this list, Aeroflot envisioned creating two sales manager positions that would permit the office to be more pro-active in seeking out ongoing commercial relationships, instead of limiting sales to passive receipt of telephone and walk-in direct sale ticket sales. Sokolov Dep. Tr. p.144:7-17; *see* McKinsey Report, p.18. It also intended that New York streamline and simplify its accounting operation, moving more of the work back to Moscow, but keeping two positions for individuals who would carry out both basic accounting, and administrative functions. McKinsey also recommended, and Aeroflot agreed, that office rental costs were too high, and should be negotiated downwards. Meeting Minutes, p.3; McKinsey Report, p.2, 3.

Aeroflot did not decide to eliminate call center agent positions generally, or Reservation and Ticketing agents in particular. To the contrary – the staffing structure to be implemented in the New York office included eight positions for "sales, call center and interaction with ARC." Meeting Minutes, p.3. Sokolov was a full participant in the meeting where these decisions were adopted. *See* Meeting Minutes; Sokolov Dep. Tr. p.154:16-155:18.

Aside from reducing headcount, Sokolov executed none of the specific decisions adopted at the January meeting. He did not renegotiate the rental contract. Sokolov Dep. Tr. p.124:7-20; 128:20-129:5. He claims it was impossible to find suitable employees for the newer, more senior "sales manager" positions – a curious result given the job market of that period, with its glut of overqualified employees for disappearing jobs. *See* Sokolov Dep. Tr. p.145:6-146:5, 147:7-13. He claims he made a unilateral decision not to touch the financial department. Sokolov Dep. Tr. p.236:3-18.

Most of all, Sokolov claims that he was left with no choice but to close the call center, despite the decision at Headquarters spelling out its intent that "call center" agents remain. Sokolov Dep. Tr. p.242:21-243:21. He argued that the local call center had become superfluous because of the new international call center in Russia – yet, Headquarters was aware of this information when it made its January 2009 decisions. *See* McKinsey Report, p.3. More broadly, Headquarters was aware of the specific conditions in the New York office: McKinsey had based its analysis on information requested from and submitted by Sokolov, and, among other things, had not recommended eliminating the call center. Sokolov Dep. Tr. p.119:9-23; 120:21-121:13; *see* Meeting Minutes.

Sokolov claims that he objected to laying off anyone in the New York office, and tried to minimize the number of layoffs. The minutes of the January 2009 meeting, however, show that Sokolov only objected to layoffs of personnel at JFK Airport, not in Aeroflot's Rockefeller Center Office. *See* Sokolov Dep. Tr. p.136:20-137:19; Meeting Minutes.

At the January meeting, Aeroflot adopted a decision to reduce local New York staff (20 at Rockefeller Center, 5 at JFK Airport) from 25 to 17 positions. Meeting Minutes, p.3. This was later revised to reduce headcount to 14 positions. Parkhurst Decl., Ex. 14, Jun. 2, 2009 Telegram; Sokolov Dep. Tr. p.162:6-164:10.

Counsel for Aeroflot tries to portray the layoffs coming in "phases" that were required by business need. Evidence in the record, however, demonstrates that Sokolov had planned to layoff specific personnel all along. In January 2009 Melgar entered Zamora's office and found her crying, and extremely upset. Zamora informed Melgar that she "was in Mr. Sokolov's office and some people are leaving." Zamora took a phone call, at which point Melgar saw her name – along with Katz, Belova and Hartoularos on a list in Zamora's handwriting. Melgar then told Zamora she saw the list and knew that she would be leaving, to which Zamora responded "I'm sorry. I tried to talk to him but he doesn't want to hear it and you guys are leaving." Melgar Dep. Tr. p.45:12-46:23.

Sokolov conducted the layoffs as follows:

- In December 2008, before Sokolov's meeting in Moscow but after he was aware of impending layoffs, Malysheva, the former General Director's wife, resigned as a Bonus agent. Zamora Dep. Tr. p.146:20-147:17; Sokolov Dep. Tr. p.57:22-58:6, 65:12-14; List of Employees.

- At the same time, Sokolov removed Oxana Knysh, who was 36 and Russian, from the "call center" that he planned to close, and made her a Bonus agent. Sokolov Dep. Tr. p.67:13-69:16, 192:7-16; Parkhurst Decl., Ex. 12; List of Employees.

- In February 2009, Sokolov informed Luba Katz (age 61) and plaintiff Arnow (57), that they would be laid off effective March 6, 2009, thereby laying off two of the three oldest employees in the office. Sokolov Dep. Tr. p.226:19-227:9, 228:4-25; Arnow Decl., Ex. 4.

- On May 1, 2009, Sokolov informed plaintiff Hartoularos (53) that she would be laid off June 1, 2009, transferring all of her administrative duties to other employees. Hartoularos Decl., Ex. 1.

- On June 6, 2009, Sokolov informed plaintiff Haith (52) that she would be laid off on June 30, 2009. Two days later, informed Guzal Sharipova, the one airport employee who was laid off, that she would also be laid off June 30, 2009. Haith Decl., Ex. 3; List of Employees.

- On July 1, 2009, Sokolov informed plaintiff Melgar that she would be laid off effective July 31, 2009. One or two months before her layoff, Melgar was stripped of her job duties performing Group Reservations, and moved back into the call center. These duties were transferred to Edita Djordjevic, who had little to do before the switch. Melgar Dep. Tr. p.44:2-11, 48:11-49:10; Melgar ¶¶24, 26, Ex. 5; List of Employees.

- On July 8, 2009, Sokolov informed Tamara Belova, the oldest employee in the finance department that she would be laid off,[4] effective September 1, 2009 so as to leave time for her to train her replacement, Irina Koroleva, who is 10 years younger than Belova. List of Employees; Sokolov Dep. Tr. p.205:22-207:9.

- On July 7, 2009, Sokolov informed plaintiff Rodriguez that she would be laid off effective July 31, 2009. Ms. Rodriguez's duties were split between Irina Koroleva and Edita Djordjevic, as well as Dragan Drobnjak and Lidieth Zamora. List of Employees; Rodriguez Decl., Ex. 2; Sokolov Dep. Tr. p.215:8-22, 216:12-20; Drobnjak Dep. Tr. p.7:20-8:8, 139:13-140:5.

- Finally, on August 6, 2009, Sokolov informed Nataliya Samuylova that she would be laid off effective August 31, 2009. List of Employees.

Seven out of the nine employees who were laid off were members of protected classes. *See* List of Employees. Defendant terminated all non-supervisory Hispanic employees. *See* Plaintiffs' 56.1 ¶239. The three employees that Sokolov identified as the oldest in the office, all close to or older than 60 years old (with dates of birth in 1947, 1949 and 1951), were laid off. *See* List of Employees. All non-managerial employees who remained after the layoffs were all of Russian or Eastern European nationality and/or ethnicity, and were younger than the employees who were laid off.

The average age of employees at the New York Rockefeller Center office before the 2009 layoffs was 46.5. After the layoffs, the average age of the remaining employees was 42.1, and the average age of the laid off employees was 51.9. *See* List of Employees. This calculation does not take into account that Sokolov's understanding of many of the remaining employees' ages is inaccurate. Sokolov believes that Drobnjak is now 40 (he is 50), Dascalovic is 40 (she is 47), Djorjevic is 40 (she is 46), Sinai is 35 (she is 42), Grossman is 30 (she is 36), and Koroleva is 40-something (she is 53). *See* Plaintiffs' 56.1 ¶¶94, 114, 165, 182, 188; List of Employees.[5] If

---

[4] Sokolov claims in his deposition that Ms. Belova resigned and told him that "Old people have to leave." Sokolov Dep. Tr. p.203:13-204:8. Belova was subpoenaed for a deposition and, under oath, refuted this claim, confirming that she was laid off involuntarily. Belova Dep. Tr. p.24:2-27:23; Parkhurst Decl., Exs. 17, 18.
[5] In contrast, Sokolov knew exactly who the three oldest employees in the Rockefeller Center office were. Sokolov Dep. Tr. p.226:19-227:9 ("Q: Was she the oldest employee in the office? A: There were three of them. Luba,

the remaining employees' ages as perceived by Sokolov is used instead of their actual ages, the average age of the remaining employees at the time of the layoffs is 34.5.[6]

All eight women whom Sokolov kept were Russian or from the former Yugoslavia in the cases of Dascalovic and Djorjevic.[7] All the tasks that are now being done by remaining staff could also be (and were) performed by laid-off employees, who were in all cases at least as experienced and qualified as those who were kept.

In explaining the need to keep those reservations agents who stayed Sokolov identified such criteria as "face to face interaction with passengers and customers;" the "experience of working with customers;" his personal knowledge that an employee was "great at college or something relevant to tourism," and that she spoke Russian "without an accent;" "prior experience in a travel agency;" "possession of an airport pass;" the ability to interact with a cargo company (a task that appeared only post-layoff), and the "priceless" experience of work as a flight attendant. *See* Sokolov Dep. Tr. p.200:10-24, 230:5-231:12, 310:17-25.

By contrast, Sokolov professed ignorance of plaintiffs' qualifications for the job. Sokolov had little to no knowledge regarding those employees he terminated, such as their education and experience, even though plaintiffs possessed several years of experience in the airline, travel, and tourism industries both at Aeroflot and at prior employers. When considering whether Rodriguez or Koroleva would replace Belova, Sokolov did not look into Rodriguez's educational background, though he was aware of Koroleva's. Sokolov Dep. Tr. p.263:20-266:4-6. Sokolov did not know anything about Arnow's extensive prior "face-to-face experience" before working

---

Florence, Tamara"),  228:4-25 ("I can judge whether a woman is 40 or 60 by their face: wrinkles, gray hair, face wrinkles, cheeks").

[6] Elena Malysheva's age was not factored into these calculations because, despite defendant's wish to include her in its explanation of the alleged layoff process, *see* Def's Br. p. 5, her resignation had nothing to do with the layoffs. Malysheva is married to Anatoli Deloveri, the General Director who resigned that position in December 2008 and whom Sokolov succeeded. Malysheva returned to Russia with her husband. Sokolov Dep. Tr. p.64:10-65:14. Thus, Sokolov was not involved with Malysheva's departure from her position at the Rockefeller Center office.

[7] Sokolov Dep. Tr. p. 192:7-16, 201:4-8, 210:7-11, 230:12-14, 233:19-23, 235:3-7, 240:23-24, 252:12-13.

at Aeroflot. Sokolov Dep. Tr. p.311:2-21. He stated at his deposition that he had never seen any of the plaintiffs' resumes before, and that he had not consulted resumes when making his layoff decisions. Sokolov Dep. Tr. p.176:2-21; Arnow Decl. ¶19, Haith Decl. ¶20, Hartoularos Decl. ¶14, Melgar Decl. ¶31, Rodriguez Decl. ¶24. Sokolov did not know that the plaintiffs received letters of praise. Sokolov Dep. Tr. p.318:6-319:11; Melgar Decl. ¶29, Ex. 4; Arnow Decl. ¶13, Ex. 3.

Even before layoffs were formally announced, there were several instances where Aeroflot management demonstrated bias against non-Russian employees. *See* Plaintiffs' 56.1 ¶¶ 220-225. In December 2008, Drobnjak told Zamora to tell Haith that she needed to change her accent because it lacked a Russian tone and had a Hispanic undercurrent. Zamora told Haith that if she did not change her accent, she could not continue working there. Haith Dep. Tr. p.74:23-78:15.

Sokolov regularly expressed animosity toward non-Russian employees. He regularly berated plaintiff Rodriguez, who had to meet with him to obtain authorization for customer refunds. Sokolov would tell her to leave, that he was too busy and did not have time for her. Rodriguez Dep. Tr. p.69:23-70:25. This culminated in Sokolov punching his desk and yelling for her to get out. His face turned red and his demeanor and expression made it appear as though he was about to become violent and strike Rodriguez. *Id.*, p78:18-79:3; p.150:4-18. Even though Sokolov was required to authorize the refunds, he made Rodriguez co-sign the authorization forms and threatened to dock her paycheck if she made mistakes.[8] Rodriguez Dep. Tr. p.57:3-59:2, p.69:3-70:25. By contrast, Sokolov gladly received Russian speaking employees in his office, including just after a non-Russian had been thrown out of his office. Melgar Dep. Tr. p.131:6-133:3, Rodriguez p.83:17-85:5, Haith Dep. Tr. p.88:4-18, p.90:14-19. Sokolov also

---

[8] Such conduct, in addition to evidence of bias, is also a violation of Section 193 of the New York State Labor Law.

showed mistrust of non-Russian speaking employees. In one instance, he refused to accept an explanation by plaintiff Rodriguez until he spoke with a Russian employee to corroborate the information she had given him. Rodriguez Dep. Tr. p.85:19-86:14. Sokolov expressed frustration toward Hartoularos because she is not Russian. Hartoularos Dep. Tr. p.109:2-111:14. When Hartoularos transferred complaining Russian-speaking passengers to Sokolov per their request (and per company policy), Sokolov would become frustrated with Hartoularos' inability to communicate with the passengers in Russian. Hartoularos Dep. Tr. p.109:2-111:14. Sokolov would leave the lunchroom there were Hispanic employees already there. If Sokolov was already eating in the lunchroom when any Hispanic employee entered, Sokolov would quickly finish his food, or put it back in the refrigerator, and leave. If there were Russian employees in the lunchroom, Sokolov would remain and speak with them. Melgar Dep. Tr. p.133:4-19; Rodriguez Dep. Tr. p.151:9-19; Haith Dep. Tr. p.84:18-88:8, p.89:21-92:6; Zamora Dep. Tr. p.177:16-179:3.

The record also contains evidence which demonstrates bias directly related to the layoffs. Lidieth Zamora, the Human Resources Manager, admitted that she confronted Sokolov with concerns that the layoffs were targeting non-Hispanic employees. In response, Sokolov did not deny the allegation, and instead threw Zamora out of his office. Zamora Dep. Tr. p.95:25--97:11. Zamora did not perform any follow up investigation of the allegations despite being the Human Resources Manager. *Id.* Furthermore, Zamora explicitly told two plaintiffs, Melgar and Rodriguez, that they were the victims of discrimination and should seek counsel to pursue a claim against Aeroflot. Melgar Dep. Tr. p.82:23-84:21; Rodriguez Dep. Tr. p.20:19-21:20. Melgar Decl. ¶33; Rodriguez Decl. ¶26. And when plaintiff Melgar saw that she was given a layoff notice (resulting in all Hispanic employees being laid off), she asked whether this was

because she was not Russian. Sokolov confirmed to her that she was being laid off because she was not Russian and did not speak Russian. Melgar Dep. Tr. p.101:8-103:8.

## ARGUMENT

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) if "the pleadings, depositions, answers to interrogatories, and admissions on file…show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). The burden of demonstrating that no issue of material fact exists lies with the moving party. See, e.g. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

Summary judgment in an employment discrimination case may only be granted if there is a "lack of evidence in support of plaintiff's position or the evidence [is] so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 54 (2d Cir. 1998); *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994) (summary judgment appropriate only if the evidence of discriminatory intent is so slight that no rational jury could find in plaintiff's favor). In performing its analysis, the court must review the entire record as a whole, not only isolated facts standing alone, and must "draw all reasonable inferences in favor of the nonmoving party," *Reeves v. Sanderson*, 530 U.S. 133, 150 (2000), "even  though contrary inferences might reasonably be drawn," *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, (2d Cir. 2010) (citing *Jasco Tools v. Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009), *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696 (1962)).

Summary judgment should not be granted when facts in the record that constitute admissible evidence "'make it arguable'" that the claim has merit. *See*, *e.g.*, *Jasco Tools*, 574 F.3d at 151 (quoting *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.

1980)). The court in considering such a motion "must disregard all evidence favorable to the moving party that the jury is not required to believe," *Reeves*, 530 U.S. at 151.

This is particularly so when an employment discrimination case turns on the intent of the employer in taking the allegedly adverse employment action. In such cases, as here, a "trial court must be cautious about granting summary judgment." *Gallo*, 22. F.3d at 1224 (2d Cir. 1994); *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001) (explaining that summary judgment should be used sparingly when the defendant's state of mind is at issue "because of juries' special advantages over judges in this area"). S*ee also Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004); *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) ("in an employment discrimination case when . . . the employer's intent is at issue, the trial court must be especially cautious about granting summary judgment"); *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997) ("caution must be exercised in granting summary judgment where motive is genuinely in issue"); *Cardozo v. Healthfirst, Inc.*, 210 F. Supp.2d 224, 227 (S.D.N.Y. 1997). *Accord Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 101 (2d. Cir 2010), *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).

To defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997). The district court must determine "whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). "Because the employer rarely leaves direct evidence of its discriminatory or retaliatory intent, the Court must carefully comb the available evidence in search of circumstantial proof to undercut the employer's explanations for its actions." *Gallo*, 22 F.3d at 1224.

### 1. Title VII

In connection with discrimination claims brought under Title VII, the Second Circuit applies the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under *McDonnell Douglas*, the plaintiff has the burden of "proving by the preponderance of the evidence a prima facie case of discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). Establishment of a prima facie case "creates a presumption that the employer unlawfully discriminated against the employee." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

The burden then shifts to the defendant to rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for its employment decision. *See Reeves*, 530 U.S. at 142-43. If the defendant meets its burden, the plaintiff must then show, by a preponderance of the evidence, that the adverse employment decision was motivated in whole or in part by discriminatory reasons. *Id*. In determining whether the employer's proffered reason is pretextual, the trier of fact may consider the evidence establishing the plaintiff's prima facie case "and inferences properly drawn therefrom." *Id*. at 143. (internal quotations omitted).

Whether summary judgment is appropriate depends on a number of factors, including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."[9] *Id*. at 149.

In an employment discrimination case, to defeat summary judgment "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Holcomb*, 521 F.3d at 138 (internal quotations

---

[9] "The standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Reeves*, 530 U.S. at 121, citing *Anderson*, 477 U.S. at 250-251 (1986).

omitted). The employer "may still raise the defense that it would have [terminated the plaintiff regardless of the protected characteristic] . . . [b]ut "the validity of that defense is ordinarily for the jury to decide at trial rather than for the court to determine on a motion for summary judgment." *Holtz v. Rockefeller*, 258 F.3d 62, 79 (2d Cir. 2001) (abrogated in part on other grounds by *Gross v. FBL Fin. Servs.*, 557 U.S. 167 (2009)).

### 2. Section 1981

Employment discrimination claims brought pursuant to 42 U.S.C. §1981 are analyzed under the *McDonnell Douglas* burden-shifting analysis. *See Mavrommatis v. Carey Limousine Westchester, Inc.*, 476 Fed. Appx. 462 (2d Cir. 2011); *Kantrowitz v. Uniondale Union Free Sch. Dist.*, 822 F. Supp.2d 196, 215 n. 13 (E.D.N.Y. 2011). Analysis of Section 1981 claims tracks that for Title VII claims.[10]

### 3. ADEA

Courts also analyze ADEA claims under the *McDonnell Douglas* burden-shifting analysis. *House v. Wackenhut Servs., Inc. et al*, No. 10 Civ. 9476, 2012 U.S. Dist. LEXIS 130879, *36 (S.D.N.Y. Aug. 20, 2012). Although the Supreme Court has questioned whether the *McDonnell Douglas* analysis applies to ADEA claims, the Second Circuit has applied the analysis to those claims, and continues to do so. *Id.* at *36 n. 3 (citing *Gross,* 557 U.S. 167; *Holowecki v. Fed. Express Corp.*, 382 Fed. Appx. 42, 45 n.2 (2d Cir. 2010)).

However, the ADEA requires plaintiffs to meet a higher burden to defeat summary judgment. "He must prove that a reasonable jury could conclude, based on the evidence, that his age was the 'but-for' cause of the challenged employment decision." *Id.* at *37-38.

### 4. New York State Human Rights Law

---

[10] One difference from Title VII is §1981's statute of limitations. Claims under 42 U.S.C. §1981 are governed under a four year statute of limitations. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382-83 (2004); *James v. Countrywide Fin. Corp.*, 849 F. Supp. 2d 296, 318 (E.D.N.Y. 2012).

Employment discrimination claims brought under the New York State Human Rights Law and the New York City Human Rights Law are also analyzed using the *McDonnell Douglas* analysis. *See Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010).

> The standards for recovery under the New York State Human Rights Law (*see* Executive Law § 296) are the same as the federal standards under title VII of the Civil Rights Act of 1964 (42 USC § 2000e et seq.; *see Rainer N. Mittl, Opthalmolgist, P.C. v New York State Div. of Human Rights*, 100 N.Y.2d 326, 330, 794 N.E.2d 660, 763 N.Y.S.2d 518 [2003]). Thus, "[b]ecause both the Human Rights Law and Title VII address the same type of discrimination, afford victims similar forms of redress, are textually similar and ultimately employ the same standards of recovery, federal case law in this area also proves helpful to the resolution of this appeal" (*Matter of Aurecchione v New York State Div. of Human Rights*, 98 N.Y.2d 21, 26, 771 N.E.2d 231, 744 N.Y.S.2d 349 [2002] [citation omitted]).

*Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 305 n. 3 (2004).

The New York State Court of Appeals has not yet addressed whether the United States Supreme Court's decision in *Gross* requires that age discrimination claims under the New York State Human Rights Law be analyzed differently than other claims. One state court has indicated that "but for" causation is now required under state law, *Anderson v. Young & Rubicam*, 890 N.Y.S.2d 45, 46 (App. Div. 2009).  Other state and federal courts, however, have recognized that the issue has not yet been conclusively decided. *DeKenipp v. State of New York*, 949 N.Y.S.2d 279, 282 (App. Div. 2012); *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp.2d 494, 505 (S.D.N.Y. 2010), *Alleva v. New York City Dep't of Investigation,* 696 F. Supp.2d 273, 285 (E.D.N.Y. 2010). Thus, under the State law, there is no reason to treat age claims under the "but for" standard of *Gross*. In *Gross*, the Supreme Court expressly noted that the ADEA used different statutory language than Title VII which required a "but for" cause standard. By contrast, New York State's Human Rights Law uses a single statutory provision to prohibit discrimination based

either race or age. N.Y. Exec Law §296. As such, there should be no elevated standard of causation for age discrimination under state law.

### 5. New York City Human Rights Law

Discrimination claims analyzed under New York City's Law are construed under a significantly more liberal standard. S*ee Williams v New York City Hous. Auth.*, 872 N.Y.S.2d 27 (App. Div. 2009); N.Y. Admin. Code § 8-130 ("The provisions of this title…shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed"). The Second Circuit has instructed district courts to "view . . . similarly worded provisions of federal and state civil rights laws as a *floor* below which the [New York City Human Rights Law] cannot fall." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (emphasis in original) (internal quotation marks omitted).

For age discrimination claims brought pursuant to New York City Human Rights Law, "there is a strong basis for applying the less-demanding 'mixed-motive' standard, whereby a plaintiff need only show that age was 'a motivating factor.'" *Saenger*, 706 F. Supp.2d at 505. District courts in this circuit have thus ruled that, "rather than requiring 'but for' causation, a plaintiff alleging a claim under [New York City Human Rights Law] need only satisfy the 'mixed-motive' standard, whereby the plaintiff need only show that age was 'a motivating factor' in her dismissal." *Rodriguez v. City of New York*, No. 09 Civ. 1378, 2011 U.S. Dist. LEXIS 91171, *34 (E.D.N.Y. Aug. 16, 2011); *see e.g., Colon v. Trump Int'l Hotel & Tower,* No. 10 Civ. 4794, 2011 U.S. Dist. LEXIS 140606 (S.D.N.Y. Dec. 6, 2011); *Attard v. New York City Dep't of Educ.*, No. 05 Civ. 2129, 2010 U.S. Dist. LEXIS 104802 (E.D.N.Y. Sept. 30, 2010);

*Weiss v. JPMorgan Chase & Co.*, No. 06 Civ. 4402, 2010 U.S. Dist. LEXIS 2505 (S.D.N.Y. Jan. 13, 2010).

## POINT I.

## PLAINTIFFS HAVE ESTABLISHED A PRIMA FACIE CASE

The burden of proof to establish a prima facie case is minimal. *Roge v. NYP Holdings, Inc.*, 275 F.3d 164, 168 (2d Cir. 2001), *Weinstock*, 224 F.3d at 42. In order to establish a prima facie case of discrimination, a plaintiff must show (1) that she was within the protected group, (2) that she was qualified for the position, (3) that she was discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of discrimination. *Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000). If a plaintiff meets this burden, discrimination is presumed. *Gallo*, 22 F.3d at 1224.

Defendant does not dispute that plaintiffs have met their burden on the first three elements,[11] but argues that plaintiffs cannot establish the fourth element of the prima facie case, namely "that their terminations occurred under circumstances giving rise to an inference of discrimination." Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def's Br."), p.17. To the contrary, plaintiffs have raised strong inferences of discrimination.

First, seven out of the nine employees who were laid off were members of protected classes at issue in this case. *See* List of Employees. Defendant terminated all except one Hispanic employee. *See* Plaintiffs' 56.1 ¶239. Sokolov terminated the five oldest employees in the office, three of whom he identified as the oldest in the office, all of them close to or older than 60 years

---

[11] Defendant contends that "Arnow's ability to establish the second element is a matter of serious doubt[,]" *see* Def's Br. p. 17 n. 11. But Aeroflot's Human Resource Manager Zamora's admitted that performance issues were not a basis for anyone being laid off, Zamora Dep. Tr. P, 72.:3-73:16. Aeroflot also issued a letter of recommendation for Arnow which called her performance "eminently satisfactory" and recommended her "unhesitatingly." Arnow Decl. Ex 4. Further, Arnow actually had almost 15 years of experience in travel reservations and ticketing before beginning her work at Aeroflot, Arnow Decl., Ex. 2.

old. *See* List of Employees; Arnow Decl. ¶2; Haith Decl. ¶2; Hartoularos Decl. ¶2. Except for

one, the employees who remained after the layoffs were all of Russian or Eastern European

nationality and/or ethnicity, and were younger than the employees who were laid off.

Courts are clear that numbers like these are sufficient to satisfy the fourth prong of the de

minimis Title VII and ADEA prima facie case. An inference of discrimination was supported in

a reduction in force case where the employer "terminated three of its four African-American

employees and none of its Caucasian, Hispanic or Asian employees." *Windham v. Time Warner*,

Inc., 275 F.3d 179, 188 (2d Cir. 2001). Additionally, "sharp changes in the average age of

employees in plaintiff's department as a result of reductions in force are also grounds for

drawing age discrimination inferences." *EEOC v. Doremus & Co.*, 921 F. Supp.1048, 1053

(S.D.N.Y. 1995) (internal citations omitted). The average age of employees at the New York

Rockefeller Center office before the 2009 layoffs was 46.5. After the layoffs, the average age of

the remaining employees was 42.1, and the average age of the laid off employees was 51.9. *See*

List of Employees. This calculation does not take into account that Sokolov's understanding of

many of the remaining employees' ages is inaccurate, *see supra* p.13. If the remaining

employees' perceived ages had been used instead of their actual ages, the average age of the

remaining employees would have been 34.5. The stark contrast between the average age of the

employees who were laid off and the employees who remained at Aeroflot clearly supports an

inference of age discrimination.

Moreover, as discussed in more detail below, Sokolov redistributed the laid-off

employees' duties to Aeroflot employees who remained. Such actions also support an inference

of discrimination sufficient to establish a prima facie case. *See Woodman v. WWOR-TV, Inc.*,

411 F.3d 69, 78-79 (2d Cir. 2005) ("decision to replace an older worker with a significantly

younger one can support an inference of intentional age discrimination even when both persons

24

are ADEA class members"); *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir.2001) ("mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of the Title VII analysis"); *Regenbogen v. Mustille*, 908 F. Supp.1101, 1116 (N.D.N.Y 1995) ("In the context of a reduction in force, the plaintiff may satisfy the fourth element by showing that his duties were not eliminated but were transferred to a co-worker who is not a member of the protected class").

Moreover, as described in more detail below, there is uncontroverted deposition testimony by the Hispanic employees (including Zamora, who continues to work at the Rockefeller Center office), and by Belova, one of the oldest employees in the office who was also laid off, that Sokolov was hostile toward them, but not toward the younger Russian and Eastern European employees. Plaintiffs' 56.1 ¶¶227-246. "A showing of disparate treatment – that is, a showing that an employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group' – is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). Defendant's contention that plaintiffs have not met their burden of establishing an inference of discrimination sufficient to make out a prima facie case is baseless.

## POINT II.

### DEFENDANT'S PURPORTED LEGITIMATE NON-DISCRIMINATORY REASON IS BASED ON INADMISSABLE EVIDENCE

In response to plaintiffs' prima facie case, defendant proffers as its legitimate non-discriminatory reason that plaintiffs were terminated because Sokolov made a business decision to eliminate the positions that plaintiffs just happened to be employed in. When responding to a plaintiff's prima facie case in an employment discrimination matter, the defendant's

responsibility to produce a legitimate non-discriminatory reason is one of production, rather than persuasion. Nevertheless, as conceded by defendant, such production must be accompanied by admissible evidence. *See* Def's Br. p.18.

In the instant case, despite extensive discovery including nine depositions and the exchange of hundreds of pages of documents on both sides, defendants rely almost exclusively on the declarations of their three managerial employees, Valery Sokolov, Dragan Drobnjak, and Lidieth Zamora. In fact of the 64 "undisputed facts" in defendant's Rule 56.1 Statement, a total of 56 of them rely on no evidence other than the assertions of the defendant.[12]  Most of these assertions are inadmissible. With respect to the Drobnjak and Zamora declarations, they must be completely disregarded because they are not based on personal knowledge. Sokolov, Drobnjak and Zamora all testified at their deposition that Sokolov made the layoff decisions on his own, and that they were not consulted in any regard.[13]  Sokolov Dep. Tr. p.164:11-17, 167:25-168:11, Zamora Dep. Tr. p.182:4-13. If so, then the declarations must be disregarded. Declarations must "be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)).

With respect to Sokolov's declaration, much of it too, is inadmissible. Many of his statements amount to legal conclusions, such as "[t]he most important factor I took into consideration in conducting such a large scale reduction in work force was always the ability to continue the operations of the New York office with the least possible negative impact on the

---

[12] Four of the eight paragraphs that do cite other evidence are part of the section attesting to the dates on which plaintiffs filed their EEOC charges.

[13] This is a departure from the characterization of the decision making process Aeroflot submitted to the EEOC. In its EEOC submissions, defendant claimed that Zamora, the one Hispanic employee who remained, was Sokolov's "right hand" in the process and "categorically denied" that discrimination had taken place.  Inconsistent explanations between an employer's submission to the EEOC and the reasons relied upon in Court are considered evidence of pretext. *Riley v. HSBC United States, Inc.*, 784 F. Supp. 2d 181, 210 (W.D.N.Y. 2011) *citing E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994)

business of Aeroflot[,]" *See* Sokolov Decl. ¶¶4, 8, 29, 35, 39, 47, 48; Def's Br. p.2. Defendant's

unsupported statements in its brief that there was no workable alternative are bald denials

tantamount to legal conclusions and they should not be given any weight. "Hearsay statements

that would be inadmissible at trial, conclusory assertions, and mere denials contained in those

affidavits are insufficient to create a genuine issue of material fact." *Patterson*, 375 F.3d at 219;

*see also Phipps v. Comprehensive Cmty. Dev. Corp.*, 2005 U.S. Dist. LEXIS 1672 (S.D.N.Y.

2005) (citing *Quinn v. Syracuse Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980)); *Nora*

*Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123-24 (2d Cir. 2001). "Where the

cited materials do not support the factual assertions in the Statements the Court is free to

disregard the assertion." *Holtz*, 258 F.3d at 73-74. This includes affidavits offered in

contravention of sworn deposition testimony. *Brown*, 257 F.3d at 252 ("factual allegations that

might otherwise defeat a motion for summary judgment will not be permitted to do so when they

are made for the first time in the plaintiff's affidavit opposing summary judgment and that

affidavit contradicts her own prior deposition testimony").

Thus, to the extent defendant has proffered a legitimate non-discriminatory reason, it has

done so on a remarkably slender reed, based almost completely on their declarations without any

supporting evidence in the record.

### POINT III.
### PLAINTIFFS HAVE PUT FORTH SUFFICIENT EVIDENCE OF DISCRIMINATION TO AVOID SUMMARY JUDGMENT

In its memorandum of law, defendants claim that if Aeroflot had a legitimate, non

discriminatory reason for its decisions, and that there were no "workable alternatives" to the

layoffs,"… then no amount of circumstantial evidence in the way of anecdotes, incidents,

subjective feelings, or statistics is sufficient to demonstrate pretext." Def's Br. p.27. This is

incorrect. A plaintiff seeking to prove discrimination may rely on any form of admissible

evidence, direct or circumstantial, to demonstrate discrimination. *See Desert Palace, Inc. v.*

*Costa*, 539 U.S. 90 (2003) (Plaintiff may use any form of evidence, direct or circumstantial, to

prove that discrimination was "motivating factor" in decision). This includes demonstrating the

falsity of the proffered explanation, *Reeves v. Sanderson Plumbing Prods.* 530 U.S. 133, 147

(2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of

circumstantial evidence that is probative of intentional discrimination, and it may be quite

persuasive"), as well as demonstrating the incredibility of the defendant's witnesses, *Hicks*, 509

U.S. 502 at 511 ("The factfinder's disbelief of the reasons put forward by the defendant

(particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the

elements of the prima facie case, suffice to show intentional discrimination").

In the instant case, there is ample evidence in the record to allow a fact-finder to

determine whether discrimination was the true reason for the defendant's actions. This includes

direct evidence of overt bias, as well as circumstantial evidence demonstrating the falsity of

defendant's proffered reason. This evidence is discussed below.

**A.     Plaintiffs Have Demonstrated Evidence of Overt Bias In The Decision Making
Process and in Their Treatment by Sokolov.**

The record contains significant evidence demonstrating overt bias in the layoff process,

as well as discriminatory attitudes evidenced by Sokolov throughout his tenure as General

Director.

First, the defendant's own human resources manager, Lidieth Zamora testified at her

deposition that she confronted Sokolov with allegations that the layoffs were being conducted in

a discriminatory manner, specifically targeting Hispanic employees. Zamora Dep. 96:7-97:11.

Sokolov refused to respond to Ms. Zamora's inquiry, and threw her out of his office. *Id.*

Sokolov's silence in response to such a charged question should be construed as an admission of

the facts contained in Zamora's statement – that Hispanic employees were being targeted in the upcoming layoffs. "[A]n admission by silence is admissible if 'there are circumstances which render it more reasonably probable that a man would answer the charge made against him than that he would not.'" *United States v. Aponte*, 31 F.3d 86, 87 (2d Cir. 2001) (citing *United States v. Flecha*, 539 F.2d 874, 877 (2d Cir. 1976)). This applies no less in the context of employment discrimination cases. *See*, *Phipps v. Comprehensive Cmty. Dev. Corp.*, 2005 U.S. Dist. LEXIS 1672, 41-42 (S.D.N.Y. Feb. 4, 2005) (Employer's silence in response to question of whether he made derogatory remark about Jamaicans considered an "adoptive admission" for purposes of summary judgment); *Asmo v. Keane, Inc.*, 471 F.3d 588, 594-95 (6th Cir. 2006) (decision maker's failure to congratulate employee when she announced to co-workers was pregnant with twins was evidence sufficient to defeat motion for summary judgment in Pregnancy Discrimination Act case). *See generally Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp.2d 251, 259-60 (S.D.N.Y. 2003) (silence may constitute admission and any ambiguities are for the jury to decide).

In this case, Sokolov was directly questioned by his Human resources manager about allegations of discrimination. An expected reaction from an employer who was obeying the law would be to deny the allegation, and perhaps explain to his Human resources manager the actual rationale behind his layoffs. Sokolov did neither, and instead abruptly threw Zamora out of the office. A reasonable jury could construe Sokolov's conduct as an admission of wrongdoing.

Second, Zamora told Rodriguez and Melgar that they should consider getting a lawyer because they were being discriminated against, and at one point planned to retain counsel herself. *See* Zamora Dep. Tr. p.83:12-86:18; Melgar Dep. Tr. p.82:23-84:21; Rodriguez Dep. Tr. p.20:19-21:20. Zamora is the Human resources manager and, according to defendant's submission to the EEOC, Sokolov's "Right Hand." *See* Parkhurst Decl., Ex. 15, Letter

Regarding Hartoularos dated June 15, 2010. Therefore, her explicit statements that the plaintiffs were victims of discrimination can be taken as a party-opponent's admission relating directly to the scope of Plaintiffs' employment and is therefore admissible. *See Zaken v. Boerer*, 964 F.2d 1319, 1323 (2d Cir. 1992).

Third, when plaintiff Melgar saw that she was about to receive a layoff notice, Sokolov confirmed to her that it was because she was not Russian and did not speak Russian. Melgar Dep. Tr. p.101:8-103:8. This is another party opponent admission which a fact-finder may consider in plaintiffs' favor.

Fourth, at his deposition, when explaining why certain employees were qualified to remain after the layoffs, such as Oxana Knysh, Irina Koroleva, and Alla Khanimova, Sokolov was able to discuss their qualifications in detail. Sokolov Dep. Tr. p.200:10-24, 230:5-231:12, 231:4-6, 263:16-19, 310:17-25. Yet he had no familiarity at all with plaintiff's qualifications, all of whom had directly relevant experience in the airline, travel, and tourism industry. *See* Plaintiffs' 56.1 ¶¶167-179.

Finally, Tamara Belova, a non-party witness, testified that Irina Koroleva had told her Sokolov had said that he would "exile" all the non-Russian employees. Belova Dep. Tr. p.38:2-39:12. Defendants object to this as hearsay, because it comes relayed from Sokolov to the witness via another co-worker, Irina Koroleva. Courts in this district have held, however, that such evidence can nevertheless be relevant In *Posner v. Sprint/United Mgmt Co.*, 478 F.Supp.2d 550 (S.D.N.Y. 2007), the Court set forth the following factors to determine whether such remarks are relevant:

> a court should consider the following factors: (1) who made the remark, i.e., a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as

discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decisionmaking process.

478 F.Supp.2d at 557

In the instant case, the remark is highly relevant, probative and reliable. It has been testified to by Tamara Belova, a third party, not the plaintiffs. The worker in question, Irina Korloleva, was extremely close with and trusted by Sokolov. Belova Dep. Tr. 52:8-53:12; Rodriguez Dep. Tr. 85:19 – 86:14. Furthermore, both Sokolov and Koroleva are under the control of defendant, and can easily be produced to confirm or deny the remark, as well as face cross-examination at trial.

In addition to direct evidence of bias in the decision making process, there is also evidence of Sokolov's discriminatory attitude throughout his tenure as General Director of the New York office, this includes the following:

- Drobnjak had Zamora tell Haith that her accent was a problem, and Zamora said that if her accent did not improve, she might lose her job. Haith Dep. Tr. p.74:23-78:15.[14]

- Sokolov expressed frustration towards and complained directly to Hartoularos and Zamora about their inability to speak Russian. Hartoularos Dep. Tr. p.109:2-111:14; Zamora Dep. Tr. p.89:10- 92:4.

- Sokolov refused to deal with or speak to Rodriguez, though he welcomed the younger, Eastern European employees into his office, including Rodriguez' subordinate. He also insisted that she co-sign refund letters to indicate she would be personally responsible for any errors, something she was never required to do before. Rodriguez Dep. Tr. p.53:6-54:22, 57:3-59:2, 60:13-23, 69:3-70:25, 78:18-79:3, 83:17-85:5, 150:4-18; Rodriguez Decl. ¶15.

- Sokolov further engaged in a humiliating exchange with Rodriguez where he refused to accept her explanation for a matter, and instead called Oxana Knysh, into the office to corroborate. Sokolov insisted on speaking with Knysh about the matter in Russian, and only accepted Rodriguez's explanation when corroborated by Knysh. Rodriguez Dep. Tr. p.85:19-86:14.

---

[14] Defendant claims that this is rebutted by Arnow's testimony and that Drobnjak is simply relaying a customer's complaint. Arnow's testimony is significantly broader, however, claiming "She was told by him that she had an accent and that no one understood her." Arnow Dep. Tr. 112:17-18. It was only on suggestion from counsel for defendant that Arnow also said that Drobnjak had also referenced a customer complaint. *Id.* 113:2-4. As Arnow noted, however, she did not actually know if a customer did complain. *Id.* Furthermore, Haith was also told that she could lose her job due to her accent by Zamora, and defendant does not claim that this was related to a customer complained.

- Sokolov abruptly left the lunch room when he saw the Hispanic employees there, though he happily stayed to socialize with Russian employees. Melgar Dep. Tr. p.133:4-19; Rodriguez Dep. Tr. p.151:9-19; Haith Dep. Tr. p.84:18-88:8, p.89:21-92:6; Zamora Dep. Tr. p.177:16-179:3.

- Sokolov rudely dismissed non-Russian employees from his office, but pleasantly welcomed Russian employees. Melgar Dep. Tr. p.131:6-133:3, 135:3-19; Rodriguez p.53:6-54:22, 83:17-85:5; Haith Dep. Tr. p.84:18-88:8, 90:14-19.

- Sokolov regularly yelled at Zamora and disparaged her for not speaking Russian. Zamora Dep. Tr. p.89:10-92:4.

- Sokolov made comments at his deposition that demonstrated his bias towards the older employees at Aeroflot. He thought of them as a group – the older workers. When asked who the oldest employee in the office was, he said, "There were three of them." When asked his basis for this knowledge, he said, "I can judge whether a woman is 40 or 60 by their face: wrinkles, gray hair, wrinkles, cheeks."[15] Sokolov Dep. Tr. p.226:19-227:9, 228:4-25.

There is plenty of evidence that demonstrates overt bias based on race, national origin, and age by Sokolov in the implementation of the layoffs. Such evidence is sufficient to defeat summary judgment.

**B. Sokolov's Decisions Were In Contradiction To What Was Directed By Corporate Headquarters.**

Aeroflot retained McKinsey Consulting in 2008 to evaluate how it could restructure its foreign operations to make them more efficient. It discussed the results of that analysis at a meeting in January 2009 at which Sokolov was present. Sokolov Dep. Tr. p.107:4-110:10, 122:13-123:2; *see also* McKinsey Report.

In the January 19, 2009 meeting, Aeroflot nevertheless adopted McKinsey's highly specific recommendations about how to restructure the New York office, which included an itemized list of what positions the office should have. Meeting Minutes, p.3. According to this list, Aeroflot envisioned creating two sales manager positions that would permit the office to be more pro-active in seeking out ongoing commercial relationships. *See* Meeting Minutes, p.1-3;

---

[15] But apparently, Sokolov cannot judge very accurately, he in fact thought the employees he retained were much younger than they were. *See supra* p. 13.

Sokolov Dep. Tr. p.144:7-17. It also intended that New York streamline and simplify its accounting operation, moving more of the work back to Moscow, but keeping two positions for individuals who would carry out both basic accounting and administrative functions. McKinsey also recommended, and Aeroflot agreed, that office rental costs were too high, and should be negotiated downwards. *See* McKinsey Report; Meeting Minutes.

On the other hand, Aeroflot did not decide to eliminate Reservation and Ticketing agent positions generally, or call center agents in particular. Meeting Minutes, p.3. To the contrary – the staffing structure to be implemented in the New York office included eight positions for "The company's own sales staff, call center and ARC coordination." Sokolov was a full participant in the meeting where these decisions were adopted. *Id.*

The only documentary evidence Aeroflot relies on in its motion are two telegrams from Moscow that specified how many employees were to be laid off, and by what date. The telegrams direct the layoff of "Dispatchers;" Sokolov stated in his deposition that this term means "any local employee" of an Aeroflot representation, regardless of position. *See* Parkhurst Decl., Ex. 14.

Sokolov executed none of the decisions adopted at the January meeting. He claims it was impossible to renegotiate the rental contract, which is difficult to believe given the accelerating real estate crisis at that time. *See* Sokolov Dep. Tr. p.124:7-20, 128:20-129:5. He claims it was impossible to find suitable employees for the newer, more senior "sales manager" positions – also hard to believe given the imbalanced job market of that period, with its glut of overqualified employees for disappearing jobs. *See* Sokolov Dep. Tr. p.145:6-146:5, 147:7-13. He claims he made a unilateral decision not to touch his financial department, a decision he himself later abrogated by laying off Belova. *See* Sokolov Dep. Tr. p.236:3-18; Belova Dep. Tr. p.24:2-27:23; Parkhurst Decl., Exs. 17, 18.

33

Most of all, Sokolov claims that he was left with no choice but to close the call center, despite the decision at Headquarters spelling out its intent that "call center" agents remain. Meeting Minutes, p.3; Sokolov Dep. Tr. p.242:21-243:21. He argued that the local call center had become superfluous because of the new international call center in Russia – yet Headquarters was aware of this information when it made its January decisions. *See* McKinsey Report, p.3. More broadly, Headquarters was aware of the specific conditions in the New York office: McKinsey had based its analysis on information requested from and submitted by Sokolov, and, among other things, had not recommended eliminating the call center in New York. Sokolov Dep. Tr. p.118:13-119:23, 120:21-121:13.

The fact that the decision maker in this case went directly against the instructions given to him by corporate headquarters is evidence of discrimination sufficient to defeat summary judgment. *See Gallo*, 22 F.3d at 1227 (appellate court ruled that district court should have drawn inference favorable to plaintiff where plaintiff claimed employer failed to follow its own policy).

## C. Sokolov's Explanations Are Questionable and Inconsistent

The crux of defendant's gambit for summary judgment is to be found in paragraph 10 of its 56.1 statement. Sokolov allegedly made all of his layoff decisions based on his "paramount concern" of "minimiz[ing] the damage to Aeroflot's business interests, and, as much as possible, maintain[ing] the effective functioning of the New York office with a reduced staff."

With this assertion, Defendant concedes that the key issue in this case is what Valery Sokolov's intent was in selecting employees for the 2009 layoffs. Defendant cannot do otherwise, since Aeroflot has offered no other evidence to suggest any possible legitimate business reason for who was chosen to be laid off. Many of Sokolov's explanations are directly rebutted either by his own deposition testimony other evidence in the record. This includes the following:

34

### 1.   Termination of Tamara Belova

Sokolov claimed that he made a decision not to lay anyone off in the finance department, but that Tamara Belova resigned, stating "Old people have to leave." Sokolov Dep. Tr. p.203:13-204:8. He claims he would have preferred that she remain working at the office, and that he would have terminated Koroleva if Belova had not left because it was too costly to have to train another employee for Belova's position. Sokolov Dep. Tr. p.206:19-207:4, 229:21-230:4. At his deposition, he asked rhetorically why he would lay off Belova just to have to retrain Koroleva. Sokolov Dep. Tr. p.253:2-7. When subpoenaed for her deposition, however, Belova directly refuted this, confirming that she was laid off. Belova Dep. Tr. p.24:2-27:23. Defendant attempts to gloss over this glaring inconsistency in a footnote, stating it is irrelevant because it "does not involve plaintiffs in any way." *See* Def's Br. p.12, n.9. This is incorrect.

First, it is strong evidence of age bias, which can be used by the plaintiffs to indicate that their termination was also influenced by such bias. Evidence of discrimination against Belova can be used as evidence of discrimination against plaintiffs. "Evidence of an employer's conduct towards other employees has long been held relevant and admissible to show that an employer's proffered justification is pretext." *Ansell v. Green Acres Contracting Co., Inc.*, 347 F.3d 515, 521 (3d Cir, 2003). *See also Chan v. NYU Downtown Hosp.*, 2004 U.S. Dist. LEXIS 16751, *16 (S.D.N.Y. Aug. 23, 2004) (Evidence concerning retaliation against other employees "is also relevant to plaintiff's ability to rebut defendants' proffered legitimate, non-retaliatory reason for its actions"). Indeed, the Supreme Court has reven ecognized that acts of discrimination attributed to other decision makers against other employees may be relevant. *See Sprint v. Mendelsohn*, 552 U.S. 379 (2008). In the instant case, the termination of Belova occurred during the same layoffs that affected plaintiffs and was made by the same decision maker. Belova's testimony is therefore relevant to the motivations behind the termination of plaintiffs.

Second, given the clear contradiction between Sokolov and Belova, a fact-finder could determine that Sokolov was testifying falsely. A fact-finder is therefore entitled to reject his testimony as to all matters. *United States v. Gilkeson*, 431 F.Supp.2d 270, 277 ("If a witness has testified falsely as to any material fact, the entire testimony of that witness may be disregarded upon the principle that one who testifies falsely about one material fact is likely to testify falsely about everything").

Third, the employee who replaced Belova, Irina Koroleva, also assumed certain duties of Silvana Rodriguez (even though Koroleva was subordinate to Rodriguez prior to the layoffs). Sokolov Dep. Tr. p.46:20-47:12. The desire to keep Koroleva at the expense of Belova also directly impacts whether Rodriguez would have remained employed, especially since Sokolov and Zamora claim in their declarations that they tried to find alternative positions for Rodriguez. *See* Zamora Decl. ¶19; Sokolov Decl. ¶46.

### 2.     The Distinction between "Call Center" Agents and Ticketing Agents.

Aeroflot attempts to create an artificial distinction between reservations agents and ticketing agents placed at the front desk and those in a separate room (the "call center"), who were out of sight of walk-in customers. Aside from this questionable geography (historically the young, Russian and Eastern European employees worked at the front desk, with older employees in the back room, *See* Arnow Decl. ¶8, Melgar Decl. ¶9, Rodriguez Decl. ¶8, Hartoularos Decl, ¶7, Haith Decl. ¶8), the only difference in the two jobs was that the agents who sat at the front desk printed the actual tickets and assisted walk-in passengers. Zamora Dep. Tr. p.25:25-26:24, Melgar Dep. Tr. p.126:12-127:19; Drobnjak Dep. Tr. p.38-40; Arnow Decl. ¶¶8-9; Haith Decl. ¶¶8-9; Melgar Decl. ¶¶9-10; Rodriguez Decl. ¶¶8-9. Plaintiffs could – and did -- work at the front desk. Melgar Decl. ¶¶12, 13, 15; Haith Decl. ¶12; Arnow Decl. ¶12. They were all originally hired as "Reservation and Ticketing Agent[s]." Arnow Decl. ¶1; Haith Decl. ¶1; Hartoularos

Decl. ¶1; Melgar Decl. ¶1; Rodriguez Decl. ¶1. When the plaintiffs were interviewed for that position, they were all asked about their prior experience with Reservation and Ticketing, and subsequently hired because of their ability to both make flight reservations and issue tickets to passengers. Arnow Decl. ¶5; Haith Decl. ¶5; Hartoularos Decl. ¶5; Melgar Decl. ¶5; Rodriguez Decl. ¶5. In fact, the Reservation and Ticketing agents who received phone calls in the back room serviced more passengers (on average, 75 per day per agent) than those who sat at the front desk (about 8-15 per day between the two agents at the ticket counter). Arnow Decl. ¶10; Haith Decl. ¶10; Melgar Decl. ¶¶7, 16; Hartoularos Decl. ¶8. Though the agents at the ticket counter were expected to answer phone calls when they were not assisting walk-in passengers, they rarely did so. Melgar Decl. ¶16; Hartoularos Decl. ¶8; Arnow Decl. ¶9; Haith Decl. ¶9. The Reservation and Ticketing agents at the front desk were not as busy as those answering calls in the back room. Melgar Decl. ¶17; Hartoularos Decl. ¶8. There was no meaningful difference between the agents who sat at the counter and the agents who sat in the back room. Indeed, it is questionable whether the call center has even been closed, as the Reservation and Ticketing agents who remained at Aeroflot still answer phone calls from potential passengers. *See* Melgar Dep. Tr. p.93:9-95:17.

### 3.    Bonus Agents

Sokolov claims that Bonus reservations required knowledge of Russian. Sokolov Decl. ¶19. Melgar performed Bonus reservation work many times, and was able to do so without a problem, despite her lack of Russian language skills. Melgar Decl. ¶¶18-20. Additionally, Sokolov claims that took Knysh out of the "call center" and made her a Bonus agent when Malysheva resigned. Knysh had never done Bonus reservations before, and was not trained to do that work until months after she was reassigned. Melgar, on the other hand, had done Bonus reservation work many times.

### 4.   ARC Department

Sokolov also claims that the remaining functions in ARC required Russian language skills. *See* Sokolov Decl. ¶45. As the ARC department supervisor, Rodriguez performed all ARC functions for about six years without problem, though she cannot speak Russian. Rodriguez Decl. ¶¶17-18. The credibility of Sokolov's claims that the plaintiffs were not qualified for their jobs because they did not speak Russian, despite their successful performance of those jobs for several years before Sokolov even arrived at the New York office, and the fact that they were hired despite not being able to speak Russian at all, should be evaluated by a jury.

### 5.   Edita Djordjevic

Sokolov could offer no cohesive explanation for why Djordjevic was kept at Aeroflot. He offered the point that she was the only employee who was trained, and had the experience of handling cargo-related matters, but then he admitted that dealing with cargo was a task that came about only well after the 2009 layoffs. And then he changed his mind and stated that her ability to learn cargo work was not a factor in her not being laid off. Yet he raised the cargo issue in response to the direct question of why he had kept Djordjevic. *See* Sokolov Dep. Tr. p.213:14-219:12; 275:6-276:6.

In fact, Djordjevic had been reassigned from job to job since her position became obsolete after the introduction of e-Ticketing in 2008. *See* Sokolov Dep. Tr. p.341:13-342:16; Arnow Decl. ¶16; Haith Decl. ¶17; Melgar Decl. ¶23; Rodriguez Decl. ¶20. For a while, she was assisting reservations agents, and correcting their mistakes. Sokolov Dep. Tr. p.211:17-212:7. The plaintiffs observed that Djordjevic had very little work to do. Arnow Decl. ¶16; Haith Decl. ¶18; Melgar Decl. ¶24; Rodriguez Decl. ¶21. And then, two months before the "closing of the call center," she was given a new assignment to perform group work, despite the fact that Plaintiff Blanca Melgar had been handling this work for at least four or five years, and Melgar

was moved back into the "call center," shortly before she was laid off. Melgar Dep. Tr. p.44:2-11, 48:11-49:10. Sokolov explained that Melgar, out of the blue, refused to do group reservations work, despite having done it for several years without complaint. Sokolov Dep. Tr. p.212:18-213:13. In fact, Melgar never refused to do group reservations. Melgar Decl. ¶26.[16]

It should be noted that Djordjevic (as well as one other remaining employee, Slavica Dascalovic) is not Russian, but from Montenegro. Sokolov Dep. Tr. p.210:5-10, 201:4-8. This does not defeat plaintiffs' claims for race discrimination, as a jury could infer that four of the plaintiffs were treated worse than the remaining employees because they were Hispanic, and that all five plaintiffs were treated worse than others because they were not Russian or Eastern European.[17] Furthermore, defendant classifies Djordjevic on its list of employees as a "ticketing agent." This is the position that requires interaction at the front desk and, according to defendant, now requires that the employee speak Russian. *See* Sokolov Decl. ¶38. Yet Djordjevic is not fluent in Russian. Sokolov Dep. Tr. p.274:16-25. Retaining Djordjevic as a ticketing agent but terminating Melgar (who actually worked at the front desk for years) because she does not speak Russian lacks any rationale and a reasonable fact-finder could infer discrimination against the plaintiffs.

There is ample evidence in the record to discredit Sokolov, and disbelieve his explanations for the layoffs. Beyond his sworn statements and self-serving declaration, there is no evidence to explain or support why the layoffs were carried out as they were. In fact, what evidence does exist of Aeroflot's intent speaks to a different plan than what Sokolov ultimately

---

[16] The idea that plaintiff Melgar, whose "call center" job was purportedly being made obsolete, would refuse during a period of layoffs to perform tasks in another area where she might be able to continue her job strains credibility. To the extent defendant asserts this as fact, it is one that must be submitted to a fact-finder, not addressed on summary judgment.

[17] Dragan Drobnjak, the plaintiffs' supervisor, is also from the former Yugoslavia (specifically Serbia). At his deposition he notably made reference to his friendship with Djordjevic. Drobnjak Dep.Tr. p. 152:15-154:17.

implemented. Plaintiffs are entitled to have a fact-finder weigh these facts – and Sokolov's credibility – as to defendant's entire case.

## POINT IV.

### DEFENDANTS HAVE NOT SHOWN THAT THE LAYOFFS WERE CONDUCTED IN THE ONLY POSSIBLE MANNER

Perhaps recognizing that there is ample evidence of discrimination, defendants also claim that they are entitled to summary judgment because under Aeroflot's requirement to reduce headcount, plaintiffs would have lost their jobs under any scenario. There are several flaws with this argument.

First, with respect to plaintiff's claims under Title VII, this is not a basis for granting summary judgment. A plaintiff who proves that discrimination was a motivating factor in an employer's decision is a prevailing party for purposes of that statute. 42 U.S.C. § 2000e-2(m). An employer then may assert an affirmative defense that it would have taken the same actions in the absence of such discrimination, but this merely limits the prevailing party's remedies. 42 U.S.C. § 2000e-5(g)(2)(B).

Second, defendant's arguments presume that the eliminated positions in the department were the only positions that could have been eliminated. This is most obviously contradicted by the fact that Aeroflot's corporate board instructed a completely different reorganization than that executed by Sokolov. The January 23, 2009 minutes explicitly provided for 8 employees to remain in positions such as the "call center" and ARC departments. *See* Meeting Minutes, p.3.

Third, as noted in prior sections, plaintiffs were eminently qualified to perform the remaining functions in the New York office, and in many cases, did perform those functions. The "ticketing agents" now answer all the telephone calls that come into Aeroflot, and Oxana Knysh, the "call center" agent who was initially transferred to work as a Bonus agent, answered

40

the phone when Melgar called the call center. Melgar Dep. Tr. p.93:9-94:17. Any of the

Reservation and Ticketing Agents (Arnow, Haith, Melgar) could have performed this job, as it

was what they had previously done.

Melgar previously performed the Bonus Agent job that was given to Knysh after Sokolov

learned that there were going to be layoffs, and based on her job duties, any of the plaintiffs

could have performed this simple work. *See* Melgar Decl. ¶¶18-20. There are also certain

employees (Koroleva, Djordjevic), whose job functions appear to have been eliminated, but who

were given an entirely new set of jobs – indeed, it appears that Djordjevic's job was eliminated

in the year before the layoffs, but she was consistently given new duties, including some stripped

from plaintiffs Melgar and Rodriguez just before their layoffs. *See* Melgar Decl. ¶¶24-26;

Sokolov Dep. Tr. p.216:3-20. Hartoularos, with her seniority, prior experience in reservations, as

well as experience with other employers in air travel and tourism, also could have assumed

almost any function at the newly reorganized office. *See* Hartoularos Decl. ¶¶1, 4, 6, 8, 9, 11.

A jury could also reasonably determine that a non-biased decision maker would have

eliminated one or more positions in the finance department, which was consistent with Aeroflot's

desire to transfer such internal dealings to Moscow and focus more on sales and marketing. A

jury could reasonably determine that one or more of the plaintiffs, with their extensive

experience in the travel and tourism industry, could have worked as one of the recommended

sales manager positions or in a support role to such a position. And a jury could also reasonably

determine that a non-biased decision maker would have known the qualifications of each of the

employees, not just the Russian ones, and determined from that point what positions should be

filled.

Given the shifting job responsibilities in the New York office, the fact that Sokolov's

reorganization of the office was against corporate directives, and the fact that Sokolov did not

conduct a discriminatory-free selection process, a reasonable fact-finder could conclude that plaintiffs would have remained employed at Aeroflot in the absence of such discrimination. This is not an instance of second-guessing a corporation's business judgment. Rather, it is refuting the baseless assertion that Sokolov implemented the only possible way to reorganize the office.

### POINT V.
### PLAINTIFFS' TITLE VII AND ADEA CLAIMS ARE NOT TIME-BARRED

Defendant claims that Arnow, Haith, Hartoularos, and Melgar's Title VII and ADEA claims are time-barred because they filed their respective EEOC charges and New York State Division of Human Rights complaint after the 300-day period following the date they were each given notice of termination. *See* Def's Br. p.40-43. Haith, Hartoularos, and Melgar filed their administrative charges on the dates stated in defendant's brief. While Arnow's charge was stamped with a June 2010 receipt date, her supporting documents illustrate that she attempted to file her charge (and thought she had) by Sept. 29, 2009. Arnow Decl., Ex. 5. The claims are not time barred.

The Second Circuit has recognized that under the "single filing rule," "where one plaintiff has filed a timely EEOC complaint, other non-filing plaintiffs may join in the action if their individual claims 'arise out of similar discriminatory treatment in the same time frame.'" *Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1056-1057 (2d Cir. 1990) (noting that single filing rule applies to both Title VII and ADEA claims, whether they are class actions or individual actions).

In cases involving small groups of plaintiffs, such as this one, "[the] mere similarity of the grievances within the same general time frame suffices to permit the 'single filing rule.'" *Id.* at 1058. "By so holding, the Circuit aligned itself with the 'broadest' interpretation of the single-filing rule." *Cronas v. Willis Group Holdings Ltd.*, No. 06 Civ. 15295, 2007 U.S. Dist. LEXIS

42

68797, *17-18 (S.D.N.Y. Sept. 17, 2007) (citing *Tolliver*, 918 F.2d at 1057-58). To determine

whether a valid EEOC charge is sufficiently similar to the non-filing plaintiff's claims to permit

application of the single-filing rule, "a court must consider whether plaintiff's claims are

reasonably related to the claims made in that charge, meaning that the conduct complained of by

plaintiff would fall within the scope of the EEOC investigation which can reasonably be

expected to grow out of the charge of discrimination." *Id.* at *21 (internal quotations omitted).

Although *Tolliver* explicitly addressed the circumstances of plaintiffs who failed to file

any EEOC charge "piggybacking" onto the lawsuits of timely filers, courts in other circuits have

held that the single-filing rule applies to those who filed administrative charges, but filed after

the 180 or 300 day time limit.[18] *Howlett v. Holiday Inns, Inc.*, 49 F.3d 189, 196-97 (6th Cir.

1995) (applying single-filing rule to both non-filers and late-filers); *Greene v. City of Boston*,

204 F. Supp.2d 239, 243 (D. Mass. 2002) ("similarly situated plaintiffs, who have failed to file

administrative charges, or who have filed untimely charges, are permitted to piggyback on a

timely-filed charge that gives the EEOC and the employer fair notice of allegations of class-wide

discrimination") (citing cases); *Riley-Jackson v. Casino Queen, Inc.*, No. 07 Civ. 0631, 2011

U.S. Dist. LEXIS 18761 (S.D. Ind. Feb. 25, 2011) ("having filed an untimely charge of

discrimination with the EEOC does not necessarily bar [plaintiff] from piggybacking onto the

timely-filed claims of other Plaintiffs") (citing cases).

There is no question in the instant case that plaintiff Rodriguez's charge is timely. And

Arnow, Haith, Hartoularos, and Melgar's grievances are similar, if not identical, to Rodriguez's

grievance, and encompass exactly the same actions, actor and time frame: from Sokolov's

appointment as Acting General Director through the 2009 layoffs. In fact, Aeroflot responded to

---

[18] While the Second Circuit has ruled that plaintiffs who file administrative charges but then file suit in federal court well after the proscribed 90-day period cannot avail themselves of the single filing rule, it has not specifically addressed the issue of a plaintiff who files an EEOC charge untimely, as some of the plaintiffs in this case did. *See Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 564 (2d Cir. 2006).

the charges of Rodriguez, Haith, and Melgar in a single response, recognizing that they were part of the same set of facts.  *See* Parkhurst Decl. Ex. 15.  They also have been on notice of both Arnow and Hartoularos's charges, having responded to them as well.  *Id.*  Defendant cannot credibly claim prejudice in allowing an application of the single filing rule in this case.

## **CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request that Defendant's Motion for Summary Judgment be denied in its entirety.

Dated: New York, New York
       November 21, 2012

Cary Kane LLP
*Attorneys for Plaintiff*

By:  _____
     Joshua Parkhurst
     Melissa Chan
     Liz Vladeck
     1350 Broadway, Suite 1400
     New York, New York 10018
     (212) 868-6300

44